The next case on our docket, United States of America v. Alvin Didier Centeno-Gamez, has been submitted on the briefs, along with the case of United States of America v. Benyanya Habar. That's also been submitted on the briefs. So the next case for oral argument presentation is Jeannine Clark v. Amtrust North America. Good morning, and may it please the Court. My name is Philip Gregory, and I'm appearing on behalf of the appellant Jeannine Clark. I'd like to reserve five minutes for rebuttal. This case involves a young mother who built a successful book of business in the construction industry as an insurance underwriter. She goes on authorized maternity leave to have her third child. She comes back. The day she comes back, her boss, Tony Weddle, tells her that the position you held prior to maternity leave is no longer available to you. All of your book of business in the construction industry has been reassigned. I've got to create a new position for you, and your prior position would have been available to you had you returned from maternity leave prior to your scheduled return date. Thereafter, the young mother is first assigned administrative duties, then she's assigned some seriously underperforming accounts where she has to work with them on an online system that itself doesn't operate, and the company admits it doesn't operate. The accounts are all in industries where she has no prior experience. In fact, the evidence is one of the three accounts didn't write premiums for more than $1,000 a month. Just to briefly explain this business, she is an underwriter, so a broker would receive a request from a client to get some insurance. The broker would then put that insurance quote out to bid. Ms. Clark, when she was in the construction industry, would be one of the underwriters who would look at that quote, bid it in essence, and she would do that based on her knowledge of the industry, based on her knowledge of the company, and her compensation would then be based both on her salary and her ability to get in the premiums necessary to meet her goals. Otherwise, she's going to get written up, perhaps even terminated, which ultimately happens here, but certainly no bonuses. And the testimony here is that her bonuses were material to her because of her family situation. I think it would probably be more effective if you make your argument in terms of the issues that have been presented and highlighted for the court. I think one of your big obstacles here is that the district court ruled against you just right down the line here on her claims that she was discriminated against or terminated because of her pregnancy and the leave that she took. I think that's the crux of your claim, correct? Yes, Your Honor. All right. So what I'd like to find out, I mean, assuming for the sake of argument that Ms. Clark here did make a prima facie case of discrimination, I understand the district court found that she didn't, but let's just assume that she did. The AmTrust cites a number of reasons as to why they ended up terminating her, and one of them was poor performance, tardiness, underwriting violations, and requests from clients to be reassigned to another underwriter. So what I'm looking to you for here today, and this is your opportunity because I really didn't see it in your briefs, is what is the specific and substantial evidence that you can point to that you put forward to show that these reasons were pretextual? Certainly. And, Your Honor, I really think that it has to start when she returns from maternity leave because that's when she's given this new book of business and set up to fail, and then at the end in September. I understand what your arguments are. You need to point to me in the record what you showed to counter, other than her statement, what you showed to counter that these reasons were pretextual. Certainly, Your Honor. So let's start the record at page 1046. Plaintiff, during the supposed reorganization, was the only underwriter with an entire book of business taken away. In terms of construction book of business, what happened there is her performance prior to maternity leave is at ER 482. We then have the January 20 meeting, which is at the record 484, and that Ms. Clark failed to meet her premium goals for the first time in her career in 2015 That's in the record at 697. Her premium goals shifted. It was originally $750,000. That's at the record at 789, and the acronym used there is Gross Written Premiums, or GWP. So her goal for the year originally was $750,000. What beyond her own statement can you point to that supports this, that she had a poor performance, that she was not tardy, that she didn't have underwriting violations? And I guess let's just start with the tardiness. Do you agree she was tardy? No, Your Honor. She was an exempt employee that had no set hourly schedule. That's at the record at 493. The same was true for the comparable employee, Regina Molloy. That's at the record at 876, where Regina Molloy never had anybody check any of her hours at any time. And Ms. Clark, what they roared her up for is she's supposedly supposed to be there at 830 in the morning, although if one looks at the employment manual, as long as she does her 40 hours a week, there's no set time when she has to show up. But she's written up for tardiness for showing up at 835 in the morning. And again, what we're talking about here is another issue. She's charged with putting her clients in the online system. The online system didn't work, which substantially affected her performance. That's at 929, 932, and 948. The other issue, Your Honor, is you talked about that there were supposedly clients who wouldn't work with her. There is no evidence in the record at all that prior to her notice of termination she was informed of this and she had an opportunity to deal with that at all. And then later on, what we have is that I believe the court said that there was one incident where she improperly wrote coverage for an excessive amount, and she admits that she did that, and she apologized, but that's not the reason that they terminated her. They terminated her because she failed to meet her goals. That was the primary, and the secondary reason is for tardiness, and that's bolstered by what the antrust defendants told the EEOC in response to the charge. But you've made a lot of pinpoint comments on things that you claim the record shows that she was not treated fairly. But there's another process, it seems to me, in your analysis here. Can you point to a specific male employee or a female employee that was out on maternity leave but who was otherwise similarly situated to Clark, and how the person was treated more favorably than your client? Can you give me even one? Regina Malloy, Your Honor, when she returned from maternity leave, she was given her book of business back. And, in fact, that's what the president of Amtrust, David Lewis, said was the policy, that when an employee goes on a leave of absence, the company's expectation is that when he or she returns from that leave, he or she will get his or her book of business back. So that was the company policy. Under all circumstances, they get the same. That's what he testified, Your Honor. And can you tell me where in the record that is? I'd like to read it. Certainly, Your Honor. And I'm sorry, may I do that? I've got the page. I'll do it when I come back up for rebuttal, if I may, Your Honor. Thank you. You have five minutes left. Do you want to resolve this? Yes, I will. Okay, thank you. Good morning. May it please the Court. Dylan Karp for the Amtrust Defendants. I do agree with the district court that Plaintiff did not make a prima facie case on the gender discrimination claim. And, in addition, Amtrust preferred evidence, non-discriminatory reasons for her termination, and Plaintiff cites no evidence that the reasons were a pretext for sex discrimination. Well, the bar for a prima facie case is very low here. I guess I'm trying to figure out how a prima facie case wasn't made. Well, I guess in two respects, Your Honor, two elements, Your Honor. One element is Plaintiff has to show that she was competently performing the position. She really submitted no evidence or argument directed to that point. But we're talking about less than a preponderance of an evidence here for this standard. So let me just ask you, let's assume that there was a prima facie case made. What's your next argument then? The next argument is that we've preferred evidence of non-discriminatory reasons for her termination. They include not only the tardiness, but the two brokers asking to be reassigned that she missed. She was well short of her goals monthly and annually. Let's take up Regina Molloy. I think that's what Counsel here said today, that she was similarly situated and there was evidence put forward by the Plaintiff here. What's your response to that? So Ms. Molloy is not a good comparator for Plaintiff because Ms. Molloy was also out on maternity leave and returned from maternity leave. So there's just a logical problem for Plaintiff to say, well, Ms. Molloy was treated more favorably than me, and therefore that gives an inference of sex discrimination. It doesn't make any sense. Ms. Molloy also went on maternity leave. For her to make that argument, I would think she'd need to point to a male or a female who had not gone on maternity leave who was treated more favorably. So was Ms. Molloy, when she returned from maternity leave, treated any differently than the Plaintiff here? No, Your Honor. Every single employee had his or her brokers reassigned in around the January 2015 timeframe, just when Plaintiff was returning from her third leave of absence. And if I could address the FMLA interference claim. So the key issue on an FMLA interference claim, unlike sex discrimination, it's not the intent of the employer, it's the factual issue of whether the Plaintiff was or was not returned to the same or a comparable position. And here the undisputed facts show that Plaintiff was returned to the same or comparable position. The factors are identified in 29 CFR 825.215. And if I could just go through them briefly. She had the same title both after and before her leave, which was underwriter. She worked in the same select business department. She earned the same compensation, received the same benefits, worked the same hours, in the same office, had the same supervisor, had the same duties and authority and responsibilities. Plaintiff contends that the reassignment of her brokers somehow made the position no longer the same or no longer comparable. She focuses on compensation and claims that the reassignment of brokers affected her ability to earn commissions because they were lower performing than her previous brokers. The problem with that argument is it contradicts the undisputed facts of the record, which was that commission was never a component of Plaintiff's or anybody else's compensation. Plaintiff did not, and the other underwriters, did not develop a book of business in the sense of going out and finding new brokers for which they're incentivized by being paid a commission on sales. That's not how the industry works. The brokers are assigned to them. Hence, that's the essence of Plaintiff's argument, that she complains about the assignment of her brokers or the reassignment of her brokers. These brokers are assigned to Plaintiff and the other underwriters, and commission is never a component of their compensation. Similarly, she contends that she lost out on the ability to earn what she contends are merit-based bonuses, but the undisputed evidence is the bonuses are purely discretionary, and they're based on factors such as profitability of division and company. So there's simply no evidence that she lost out on any ability to earn a bonus based on the reassignment of brokers. I heard opposing counsel highlight that one of Plaintiff's complaints is that the reassigned brokers were in industries other than construction, and she focused on construction before her leave, but the undisputed facts are that of all the accounts that she opened in 2015, a full 80% of them, 34 out of 42, were in the construction industry. So there's simply no evidence that when she returned from her third leave in 2015, it was in anything other than the same or a comparable position. What about the statement that had she returned from maternity leave sooner, her prior position would have been available to her? Yes, Your Honor. So I think there are two reasons why that is not enough to raise a triable issue of fact regarding her interference claim. First of all, the intent of the employer on an interference claim is not the issue. It's was she or was she not returned to the same or comparable position. You've got to look at the facts of what the position were, and I believe as I've outlined it was actually the same or a comparable position. Well, it clearly wasn't the same position. It was comparable, you're saying? It was at least comparable, Your Honor. It seems, let me just tell you, because on this, you know, her allegation of demotion upon return from maternity leave is interesting to me, and I've been struggling with it a bit because it seems, at least in my view, whether summary judgment was appropriate on this claim is a relatively close call because on one hand, the scenario she alleges is plausible. That is, because of her leave, her former clients were taken from her and she was given underperforming accounts. The scenario also has support from the record, and I believe it's undisputed that her previous accounts were reassigned and that Clark's new accounts apparently justified lower financial targets. I think those are the points that your friend across the aisle was trying to make. It also seems entirely plausible that the lower-performing accounts could lead to job performance problems and a lower bonus, even if that bonus wasn't explicitly tied to financial targets. On the other hand, taking what you've submitted in your briefs and here today, it seems like AmTrust's account is also plausible and appears to have, you know, support in the record. It looks like the evidence that you adduced on behalf of your client showed that all underwriters and accounts had the accounts reassigned, all of them did, that later underwriters assigned to the same accounts as Clark were able to meet targets in line with those set for Clark and that Clark's compensation remained unchanged despite the new accounts. So the question is, you know, was summary judgment appropriate here? And I tend to look at what the district court focused on and that despite the opportunity to take discovery on many of these issues, it looks like Ms. Clark failed to develop additional facts to support her claims beyond her declaration. And that's what I'm struggling with. Is there other items other than her declaration? I've tried to ask that of her counsel. Is there anything else that you identify that she has put forward? I think Your Honor summarized the evidence that's in the record. The district court did cite two district court cases that have addressed analogous fact patterns and they both did hold, similar to the district court below, that reassignment of accounts or refocusing on accounts even where commission was an issue is still not enough to make a position non-comparable after a leave. We cited the Breeden case and the Yen case. I guess the other question I had for Amtrust was whether or not the district court was right in saying that Ms. Clark here failed to exhaust her claim regarding retaliation for filing her administrative complaint. This relates to, I guess, whether or not her DEFEH complaint, she alleges that she was subjected to discrimination and retaliation. The complaint also states that my portfolio of clients have been taken away and given to another employee in retaliation for me taking leave and I received a negative annual review in retaliation for taking my leave. And so I'm just not quite sure why the Freeman case doesn't control here and should her Claim 5, Retaliation for Filing a Complaint in Violation of FEHA, not survive here. Yes, Your Honor. I would say for two reasons. Number one, I think the district court was correct that Ms. Clark did not exhaust her administrative remedies. It's true that the word retaliation is in her administrative complaint. However, it's not retaliation in the sense of I opposed unlawful activity and was retaliated against. It was solely retaliation in the sense of an FMLA interference claim, that I went on leave and in, quote, retaliation, I suffered adverse action. And that's a very different type of retaliation case than a FEHA retaliation case for opposing alleged wrongdoing. Well, I guess trying to look at the record here and then, you know, the Freeman case, Freeman v. Oakland Unified School District, which says it's appropriate to consider such factors as the alleged basis for the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred to determine whether the retaliation claim is encompassed within the scope of an administrative complaint. And here, all the alleged facts of retaliation and discrimination involve the same individuals, Mr. Weddle, Lewis, an Amtras HR representative, in the same relatively short time frame and at the same location. So why wouldn't that be something that would be found during the course of this and brought under the Freeman umbrella? Your Honor, Freeman says, as we quoted in our brief, the inquiry into whether a claim has been sufficiently exhausted must focus on the factual allegations made in the charge itself, describing the discriminatory conduct about which a plaintiff is grieving. It's just a different type of retaliation to say an adverse action was made because a plaintiff went on leave from an adverse action was made because a plaintiff allegedly opposed unlawful activities. And I understand retaliation for filing a complaint is not the same as retaliation for taking leave, but I guess my question is, aren't these allegations like or reasonably related? Our contention is they're just different. That an investigator, the way the cases frame it is, would an investigation, plaintiff requested a right to sue, so there was no real investigation done. Well, wouldn't an investigation of the former have grown out of an investigation of the latter? I would say no. There's no reason for an investigator to look into whether and when and how did plaintiff oppose unlawful activity because that wasn't germane to her allegations. Even though the word retaliation was in there, it was tied solely to her taking leave, not opposing unlawful activity. And assuming she did exhaust, then we get to the merits. And assuming she made a prima facie case, I believe she relies solely on the temporal sequence of events. Well, we've preferred evidence of non-retaliatory reasons, the tardiness, the failure to meet her goals, the broker's request to be reassigned, and I think plaintiffs rely solely on the temporal sequence of events to try to raise a triable issue of fact, and the case law is clear that even though sequence can be enough to make a prima facie case, once the employer prefers evidence of a non-retaliatory reason, you need more than that to survive summary judgment. I don't think we have that here. Are there any other questions? Mr. Karp, thank you very much. Thank you very much. May I please have the court answer Your Honor's questions about where the testimony is from the President, David Lewis, concerning her getting her book of business back. That's at ER 745. When she writes, I'm sorry, he testifies, the second example you're showing is an example of an individual in which she still technically, in this case we're talking about Janine, meaning Ms. Clark, has that book of business. However, because of her absence, other underwriters are stepping in to help service it. We're going to continue to book it under her name because the expectations are when she returns from leave or any employee returns from leave, that book of business is still going to be theirs. Well, in this case, it wasn't just hers. Your friend says that this was something that was done the whole company, reorganization. So every employee suffered the same problem. And that's not what the evidence shows, Your Honor. And, in fact, the testimony is she's the only individual who had her entire book of business taken away. And it's also important to note that it was taken away, as Mr. Weddle said to her on January 20, because she stayed longer on leave. Had you been back sooner, your position and your book of business would have stayed with you. But the new book of business she got was largely the same type of business she had before, correct? No, Your Honor. The 80% estimate made by your friend was in error? That's what she ended up writing. But what she was given initially was completely outside of the construction industry. That's not disputed by anybody. She ended up doing additional work and getting other work in to meet her goal. But what she was initially given was completely outside the construction industry. So what does that show when they, if even taking that, that she's being penalized, does that still show merit when you take the full context that she was given substantially what she had before? And I think this is where it's important, Your Honor. What she was writing before she left on maternity leave was millions of dollars in premium. And she comes back, and they say to her, we're going to give you three accounts, one of whom who hasn't written business for more than $1,000 a month, and two others that the company Amtrust is thinking of terminating. That's the evidence. And then she's given a goal of $750,000. What's important is that's the goal she's given when she comes back. When she's terminated, she's terminated because from February to August she hadn't reached a new goal, a goal that's not supported by the record of $800,000, and that's at ER 1247. You're saying a lot of things in the record, but you're not answering my question. I'm sorry. My question is, when they did the same thing to all of the employees, and she was treated the same as all of us, and she got 80%-plus back in the same thing, doesn't that indicate evidence that she is not being discriminated against because they were treating her the same as every other employee? And my answer, Your Honor, is A, when she came back from work, she didn't get construction business. You've said that again and again and again. And then B— That's not my question. If you'd answer my question, I'd appreciate it. Perhaps I'm not understanding. So what she ended up doing is scrambling to write premiums, and she ended up writing some premiums in the construction industry to meet her goal. But she wasn't given those brokers as the construction industry brokers as her clients. You mean she didn't get exactly the same back? She didn't get any construction industry clients. You see, the evidence that was pointed to by your colleague is every other employee was treated the same. They all got refurbished. And so I don't see—I'm having difficulty because you haven't answered his question and made his argument. That's why I wanted to give you a chance to do it. Certainly. But I think perhaps there's a disconnect. She wasn't given clients in the construction business, and she was never given clients in the construction business. Oh, he was incorrect when he said over 80 percent of her cases were in the same business as before. What Your Honor is talking about is what premiums she ended up writing versus the clients she had. She never had clients in the construction business. At any time, either before or after? No, after she returned from maternity leave. Now, what is the 80 percent of the business counsel said that she got back when they redid all of the clients? And he said over 80 percent of her business was the same as she had before. Is he being fair with the record? Eighty percent of the premiums she ended up writing were in the construction business, but she was not assigned any clients in the construction business. But she's treated exactly the same as every other person. They all did this. No, Your Honor, because the evidence is each underwriter was supposed to nurture and build business from his or her client base, and that sometimes you did work for other people or you did work in other clients, but those weren't necessarily your clients. If she got exactly the same, this 80 percent or whatever it is, as every other employee, I don't see how that shows she's been penalized. That's the point he was making, and that's the question I'm asking. But she was penalized, Your Honor, because the clients that were hers weren't in the construction business from the day she returned to work to the day she was terminated. They were in other industries. These were clients of hers, that is, who were assigned to her by the company. Outside of the construction industry in February 2015. She assigned her different clients, treating her the same as all other people. No, Your Honor. That's not correct. Okay. I'm sorry. I just haven't seen the connection yet. But that's all right. I don't want to take all of your time. Thank you very much. Appreciate your argument here today, Mr. Gregory and Mr. Karp. The case of Janine Clark v. Amtras North America is submitted.
judges: Wallace, Murguia, Lasnik